UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **JASON ANTHONY MATT** | **CASE NO. 6:20-CV-00829** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **NORTHWESTERN MUTUAL LIFE INSURANCE CO** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

MEMORANDUM RULING

Before the court are cross-motions for summary judgment [docs. 21, 22], filed on the issue of the decedent's coverage under a life insurance policy issued by the defendant. Both motions are opposed. The matter came for hearing before the undersigned on January 18, 2022, and the court now issues this ruling.

I.
BACKGROUND

This dispute arises defendant Northwestern Mutual Life Insurance Company's efforts to cancel coverage under a term life insurance policy after discovering alleged material misrepresentations by the decedent, Steven Matt, on his application. Matt executed an "Individual Life Insurance Application" on May 8, 2017, and completed and executed the second part of the application, the "Medical History Questionnaire" ("MHQ"), the following day after meeting with a paramedical examiner. Doc. 22, atts. 4 & 5. He also executed an "Authorization for Release of Health Information." Doc. 22, att. 9. Based on these forms and information received from the examiner, the decedent was

1

approved for coverage at the premier classification rate and issued a life insurance policy in the amount of $350,000, effective May 1, 2017. Doc. 22, atts. 10 & 11.

The decedent received a copy of the policy. *See* doc. 22, att. 12 (policy delivery acknowledgment, executed on May 30, 2017). Under § 1.4 Incontestability, the policy states that the company has relied on the application in issuing the policy and may contest the policy if it has been in force for less than two years during the lifetime of the insured.[1] Doc. 22, att. 11, p. 9. During this period, the company may rescind insurance or deny a claim "on the basis of a material misstatement in the application(s)[.]" *Id.*

The decedent died by suicide on or about April 15, 2019, in Lafayette, Louisiana. Doc. 21, att. 4, p. 5. Shortly thereafter Northwestern was informed of his death. Doc. 22, att. 3, ¶ 13. The beneficiary of the policy at the time was a trust designated under the will of the insured, for the benefit of his two minor children. Doc. 22, att. 13. Northwestern employee Jason Rudelich sent a letter to Jason Matt, the trustee and plaintiff in this matter, on April 22, 2019. Doc. 22, att. 14. Rudelich informed plaintiff that, because the policy was less than two years old, Northwestern would be conducting a review to confirm that the information provided in the application was complete and accurate. *Id.* He also enclosed forms and authorizations related to the claim and review process. *Id.*

Relevant to this matter, the decedent answered "No" to the following questions on his MHQ (completed on May 9, 2017): (1) if he had used tobacco or nicotine products, including smoking cessations products, in the last five years, (2) if he had ever sought,

---

[1] Outside of this period, the company reserves the right to contest coverage in cases of fraud. *See id.*

2

received, or been advised to seek treatment or counseling for use of alcohol or drugs, (3) if he had otherwise consulted a healthcare provider in the last five years, (4) if he had otherwise been a patient in a hospital, clinic, rehabilitation center, or medical facility in the last five years, and (5) if he was taking any medications other than what he had already disclosed. Doc. 22, att. 5. He answered "Yes" to a question asking if he had been diagnosed with or treated for "[a]nxiety, depression, stress, bipolar disorder, attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), eating disorders or any other psychiatric or mental health disease or disorder" in the last ten years. *Id.* In the space to explain his answer, he only provided details relating to an ADHD diagnosis, for which he took Vyvanse, and treatment with one provider, Dr. Boris Rubashkin. *Id.*

Based on his review, however, Rudelich uncovered a significant and recent history of mental health treatment on the part of the decedent. He learned through a social media investigation that the decedent, who had completed the application as a resident of Lafayette, Louisiana, had also lived in Houston, Texas, at times prior to and after the issuance of the policy. Doc. 22, att. 3, ¶ 16. Using the decedent's Houston ZIP code, Rudelich discovered that the decedent had been treated by multiple undisclosed providers between July 2016 and May 2017, and filled prescriptions during this period for lithium carbonate (a drug for the treatment of bipolar disorder) and the antipsychotics aripiprazole and quetiapine fumarate. *Id.* at ¶¶ 16–20; doc. 22, att. 17.

The decedent first saw Dr. Chad Manuel on May 2, 2017, one week before he completed his life insurance application. Doc. 22, att. 19. At that appointment he stated

3

that he had been diagnosed as bipolar.[2] *Id.* at 4. Records from Dr. Boris Rubashkin, the only provider disclosed in the MHQ, indicated that, as of September 2016, the decedent used tobacco products every day. Doc. 22, att. 20, p. 4. In those records the decedent also referenced a hospitalization in August 2016 for depression and an adolescent history of drug use. *Id.* at 8. Dr. Rubashkin, who last saw the decedent in December 2016, listed his diagnoses as major depressive disorder, adjustment disorder, anxiety disorder, and ADHD. *Id.* at 3. Finally, Northwestern obtained records from Dr. Richard Broussard, who saw the decedent in January 2018 and recorded his history of bipolar disorder.[3] Doc. 22, att. 21.

    This information was reviewed by underwriter Tim Labecki, who provided a memorandum outlining the impact the inconsistencies between the above information and what was provided during the underwriting process. Doc. 22, att. 22. He noted that Northwestern was still awaiting records from two other physicians who had prescribed medications to the decedent. *Id.* Labecki stated, however, that the existing records were sufficient to show misrepresentations on the decedent's tobacco usage and mental health history. He concluded that the tobacco history would have required the policy be issued at tobacco rates and that "[g]iven the severity of the [mental health] symptoms prior to and around the time of the application, we would not have issued this policy." *Id.* at 3.

---

[2] At the visit on May 2, 2017, the decedent told Dr. Manuel that he was not currently taking lithium. Doc. 22, att. 19, p. 4. Dr. Manuel prescribed lithium, quetiapine, aripiprazole, hydroxyzine, as well as medications (Vyvanse and Adderall) for his ADHD. *Id.* at 3.

[3] Dr. Broussard saw the decedent in January 2018 for evaluation of blood in stool. Doc. 22, att. 21. The decedent had informed Dr. Broussard that the symptoms began a year ago, though as Northwestern points out, he answered on his MHQ that he had not "been told [he] had, been diagnosed with, or been treated for" any of several conditions, including blood in the stool, over the last ten years. *Id.*; doc. 22, att. 5. There is no indication that the decedent sought medical attention for his symptoms prior to May 2017, or was told he should do so. Accordingly, the court will not evaluate this response as part of the decedent's alleged misrepresentations.

4

On October 24, 2019, Rudelich sent plaintiff a letter outlining the results of the contestability review and informing him of Northwestern's decision to rescind the policy and refund the decedent's premiums. Doc. 22, att. 23. The plaintiff filed suit against Northwestern in Louisiana state court in his capacity of trustee, alleging breach of the life insurance contract and bad faith failure to pay. Doc. 1, att. 1. Northwestern then removed the matter to this court on the basis of diversity jurisdiction, 28 U.S.C. § 1332.

In the course of discovery, Northwestern has obtained additional medical records showing the decedent's mental health history at the time he completed his life insurance application. The records of Dr. Josephus Barnes, a psychiatrist based in New Orleans, show that he treated the decedent regularly from 2012 to 2016. Doc. 22, att. 26. The notes are handwritten and hard to read, and specifications regarding treatment appear to relate to the decedent's ADHD. *See id.* However, Dr. Barnes makes multiple references to the decedent's history of depression and anxiety. *Id.* Northwestern also obtained records of a July 2016 ER visit, reflecting that the decedent had accidentally overdosed on his ADHD medication while vacationing with his family. Doc. 22, att. 27, pp. 12–14. In this visit the hospital recorded a history of anxiety and depression and that the decedent currently smoked every day. *Id.* at 14. Notes from this visit show a history of thoughts of self-harm within the past week and a suicide attempt within the last year. *Id.* at 21.

Northwestern also obtained more extensive records from Dr. Rubashkin's office. These show that the decedent saw a counselor, Gina Baiamonte, in Dr. Rubashkin's office upon returning from the July 2016 vacation and ER visit. Doc. 22, att. 28. Over multiple sessions in the summer and fall 2016, the decedent reported marital conflict, depression,

5

and his adjustment issues with various medications. *Id.* He admitted to a history of trauma and three prior suicide attempts. *Id.* at 12–13. During this time he had another ER visit, in August 2016, for severe anxiety. Doc. 22, att. 29. He was discharged after two days and immediately admitted to Houston Methodist Hospital, where he remained for five nights. *Id.*; doc. 22, att. 30.

At Houston Methodist, the decedent was treated under a primary diagnosis of bipolar disorder. Doc. 22, att. 30, pp. 24–34. He was discharged to the care of Dr. Scott Sprabery, a psychiatrist. *Id.* Sprabery saw the decedent five times between August 2016 and March 2017, regularly prescribing and adjusting medications for the treatment of the decedent's bipolar disorder. Doc. 22, att. 31. The decedent moved back to Louisiana at some point in 2017 and began seeing psychologist Dr. Lyle LeCorgne in April 2017.[4] Doc. 22, att. 32. In his intake paperwork he described a history of depression and anxiety, stating that he had voluntarily admitted himself to inpatient treatment for depression in August 2016. *Id.* at 13–14.

Northwestern now moves for summary judgment, asserting that the records establish material misrepresentations in the May 2017 application warranting a rescission of the life insurance policy. Doc. 22. Plaintiff opposes this motion and likewise moves for summary judgment, arguing that there is insufficient evidence of the decedent's intent and that Northwestern should not be allowed to rescind the policy since it could have accessed more information on the decedent's mental health history before issuing the policy.

---

[4] During this time the decedent's brother, a physician, also prescribed medications. *See* doc. 22, att. 17.

6

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

### III.
### LAW & APPLICATION

Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity jurisdiction applies the substantive law of the forum state. *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991). Louisiana law provides:

> B. In any application for life, annuity, or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless either one of the following is true as to the applicant's statement:
> (1) The false statement was made with actual intent to deceive.
> (2) The false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer under the policy.

La. Rev. Stat. § 22:860(B). Accordingly, an insurer can establish an affirmative defense to coverage by showing that: (1) the insured made a false statement in his insurance application; (2) the false statement was material; and (3) the insured's false statement was made with an "intent to deceive" the insurer. *Smith v. Liberty Life Ins. Co.*, 2012 WL 6162757, at *2 (E.D. La. Dec. 11, 2012) (citing *State Farm Mut. Auto. Ins. Co. v. Bridges*, 36 So.3d 1142, 1146 (La. Ct. App. 2d Cir. 2010)).

In this context, "[a] misrepresentation is material if the truth would have resulted in the insurer not issuing the policy of insurance or issuing the policy at a higher rate." *Gwin v. Liberty Mut. Ins. Co.*, 2017 WL 3574443, at *5 (W.D. La. Aug. 17, 2017) (citing *Abshire v. Desormeaux*, 970 So.2d 1188, 1196 (La. Ct. App. 3d Cir. 1996)). Because of the "inherent difficulties of proving intent" behind a misrepresentation, Louisiana courts do not require strict proof of fraud. *Bridges*, 36 So.3d at 1147. Instead, intent is determined

from circumstances indicating "the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality thereof, or from circumstances which create a reasonable assumption that the insured recognized the materiality of the misrepresentations." *Id.* While the involvement of intent makes it trickier for the defendant to prevail, the case must be evaluated like any other and "the allegation of intent does not spontaneously shield a case from summary judgment." *Trahan v. Transam. Life Ins. Co.*, 2020 WL 3197625, at *11 (M.D. La. Jun. 15, 2020) (quoting *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996)).

Plaintiff argues that there is no evidence of the decedent's intent to deceive, citing (1) the timing of his suicide (nearly two years after the policy was purchased, but still within the contestability period), (2) the paramedical examiner's testimony that she had no recollection of his interview, and (3) Rudelich's admission that he had no evidence that the decedent purchased the policy with the intention of committing suicide. Doc. 21, att. 6, p. 11; doc. 21, att. 9, p. 46. Plaintiff also argues that Northwestern has waived its right to contest the policy based on the decedent's misrepresentations, because it had the opportunity to investigate his health history and uncover the inconsistencies between the MHQ responses and the medical records at the time the policy was issued.

The court notes that the intentional misrepresentation jurisprudence only requires that the misrepresentation be material, not that it relate to the insured's overall purposes with respect to the policy. The court also finds no support for plaintiff's argument that an insurer loses its right to conduct a contestability review if it does not audit the application for misrepresentations before issuing the policy—especially where, as here, the application

9

gave no indication as to the underlying mental health issues. *Compare Foster v. United of Omaha Life Ins. Co.*, 2010 WL 3834047, at *11 (W.D. La. Sep. 24, 2010) (insurer waived right to rescind policy based on misrepresentation when it "had in its files" a report regarding insured's adverse health history but failed to inquire further). Accordingly, the plaintiff's arguments are beside the point and the issue is instead whether intent can be imputed from the nature of the misrepresentations.

      In this matter the decedent obscured a significant and recent mental health history—one that any reasonable person knows would cause him to face difficulties obtaining life insurance. He did this by failing to disclose prior hospitalizations, diagnoses, medications, and treatment providers even though the MHQ clearly called for such information. He also answered falsely about his tobacco usage. He gave these responses knowing that Northwestern would use them to determine if and at what rate he could obtain life insurance. The loss of benefits to the decedent's children is unfortunate, particularly after the tragedy they have already suffered. However, the decedent obtained his coverage based on material false statements about his health history that could only have been made with the intent of deceiving Northwestern. Accordingly, Northwestern has established an affirmative defense to coverage and is entitled to judgment as a matter of law.

## IV.
### CONCLUSION

For the reasons stated above, the plaintiff's Motion for Summary Judgment [doc. 21] will be **DENIED** and the defendant's Motion for Summary Judgment [doc. 22] will be **GRANTED**. Accordingly, **IT IS ORDERED, ADJUDGED,** and **DECREED** that all claims against Northwestern Mutual Life Insurance Company be **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Chambers on this 20th day of January, 2022.

*[Signature]*
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**